## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NEW YORK

EMMET KENNY,                          )
                                  )
      Plaintiff,             )
                                  )
v.                                    )
                                  )   Civil Action No. 1:10-cv-01010
MERCANTILE ADJUSTMENT                 )
BUREAU, LLC                           )
                                  )
      Defendant.             )

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF'S MOTION TO ALTER OR AMEND JUDGMENT

### PRELIMINARY STATEMENT

This is a case brought by Plaintiff for damages for Defendant's alleged violations of the Fair Debt Collection Practices Act (FDCPA) 15 U.S.C.§§1692b(1), 1692c(b), 1692d and 1692d(5).  Plaintiff also sought damages under the Telephone Consumer Protection Act (TCPA) 47 U.S.C.§227, et seq.  Finally, Plaintiff alleged the Defendant had committed the state tort of Intentional Infliction of Emotional Distress (IIED claim).

On November 30, 2011, Defendant moved for summary judgment dismissing all of Plaintiff's claims.  Plaintiff opposed the motion.  Thereafter, on May 2, 2013, this Court entered a judgment dismissing all of Plaintiff's claims.

Through the vehicle of Rule 59(e) of the Federal Rules of Civil Procedure, Plaintiff moves to alter and/or amend the Court's judgment by vacating the dismissal of his claims under 15 U.S.C.§1692d and the TCPA.  Plaintiff does not seek to alter or amend the Court's judgment with respect to 15 U.S.C.§§1692b(1), 1692c(b), 1692d(5) or his IIED claim.

This Memorandum of Law is submitted in support of Plaintiff's motion.

## ARGUMENT

### I.   PLAINTIFF HAS A VIABLE TCPA CLAIM

Plaintiff filed his memorandum of law opposing Defendant's Motion for Summary Judgment on December 14, 2012. (Docket No. 37).  The Defendant filed their reply on December 21, 2012, at which time briefing was closed under the scheduling order issued by this Court.

Unbeknownst to Plaintiff, and apparently the Defendant as well, a new FCC Ruling was issued on November 29, 2012.  Neither party nor this Court have considered this Ruling which was in effect at the time the Court issued its' decision on May 1, 2013.  As will be shown below, this Ruling goes to the heart of the issues that were before this Court, to wit:  Whether a person who gives consent to a debt collector to be called on his cell phone can later revoke that consent, and if so, can that revocation be done orally?

It is submitted that the failure of both parties to bring this Ruling to the attention of the Court is excusable.  Plaintiff is unaware of any case that has cited the Ruling, and frankly, does not review the FCC's Rulings on a regular basis.  In addition, there is no prejudice to the Defendant to the reargument of Plaintiff's TCPA claim pursuant to this motion.  Accordingly, it is submitted that this Court should reconsider its decision in light of the new Ruling. *Long v. Crowley*, 2010 WL 5129102 (W.D.N.Y.2010).

### A.   THE FCC'S RECENT SOUNDBITE RULING RECONGNIZED THAT PRIOR EXPRESS CONSENT UNDER §227(b)(1)(a) CAN BE REVOKED.

#### 1.   The SoundBite Ruling Clarifies That Consent Can Be Revoked.

On November 29, 2012, the FCC issued a declaratory ruling, *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, SoundBite Communications, Inc.,*

--- FCC Rcd. ---, No. 02-278, 2012 WL 5986338 (hereinafter "SoundBite").  The FCC

acknowledged that a consumer's prior express consent under 47 U.S.C.§227(b)(1)(A) can be

revoked.  Specifically recognizing that "neither the text of the TCPA nor its legislative history

directly addresses the circumstances under which prior express consent is deemed revoked," the

FCC, citing its *Chevron*[1] powers to interpret the TCPA, recognized that a consumer can opt-out

of her "prior express consent" to receive autodialed text messages on her cell phone. *SoundBite*

at ¶¶ 7-8.  The FCC's declaration in *SoundBite* construes the very subsection of the TCPA at

issue in this case, is reasonable, and provides this Court a clear basis for vacating its' decision in

this case.

The *SoundBite* petition posed the question of whether sending a one-time text message

confirming a consumer's request to opt out of autodialed text messages to her cell phone would

violate the TCPA.  The FCC held it would not.  The TCPA does not mention text messages

expressly.  However, the FCC has explicitly stated that the TCPA's prohibition at 47

U.S.C.§227(b)(1)(A) - the very section at issue here – "encompasses both voice calls and text

calls to wireless numbers."  *In re Rules and Regulations Implementing the Telephone Consumer*

*Protection Act of 1991, Report and Order* 18 FCC Rcd, 14014, 14115 (July 3, 2003).  *See also*

*Satterfield v. Simon & Schuster, Inc.,* 569 F.3d 946, 952 (9th Cir.2009) ("a text message is a 'call'

within the meaning of the TCPA").  It is unlawful "to make any call" to a cell phone using an

Automated Telephone Dialer System unless the caller can meet a narrow exception for: (1)

emergency purposes or (2) having prior express consent of the called party. 47

U.S.C.§227(b)(1)(A)(iii); *Satterfield,* 569 F.3d 954-55 (recognizing "prior express consent"

required for autodialed text messages to cell phones.

---

[1] *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837 (1984).

In its petition, SoundBite Communications, Inc. stated it sends text messages on behalf of a number of companies that have obtained express consent to send text messages to particular wireless subscribers. *SoundBite* at ¶ 3.  When a consumer sends a text message response "opting out" of receiving future text messages, SoundBite sends a one-time reply via text message to the consumer to confirm receipt of the opt-out request. *Id.*  SoundBite requested clarification from the FCC as to whether that "confirmatory" text message violated the TCPA as not being made with the "prior express consent" of the recipient, the consent having been revoked by the called party's opt-out text.  The FCC granted SoundBite's petition, and held that the "one-time text confirming a request that no further text messages be sent does not violate the TCPA or Commission's rules . . .". *Id.* at ¶ 7.  The FCC stated that "the consumer's prior express consent to receive text messages from an entity can be reasonably construed to include consent to receive a final, one-time text message <u>confirming that such consent is being revoked at the request of that consumer.</u>" *Id.* (emphasis added).

The FCC expressly recognized that it was making the determination of "whether 'prior express consent' within the meaning of §227(b)(1)(A) is revoked when the consumer sends an opt-out request" and that "neither the text of the TCPA nor its legislative history directly addresses the circumstances under which prior express consent is deemed revoked." *Id.* ¶ 8.

The FCC's filling of this "statutory gap" through its declaratory ruling is reasonable, and is entitled to deference. *See Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs.,* 545 U.S. 967, 980-81 (2005) (deferring to FCC declaratory ruling pursuant to *Chevron* where telecommunications statute was ambiguous, and the agency's construction was reasonable).  Citing its powers to interpret "prior express consent," the FCC held that such consent can be revoked and that allowing this one-time confirmatory message after revocation of consent "is

consistent with the goals and objectives of the TCPA." *SoundBite* at ¶ 8.  Finally, the FCC specifically "acknowledge[d] that consumer consent to receive [autodialed text] messages is not unlimited," considering the TCPA's goal of "protecting consumers from unwanted autodialed communication." *Id.* at ¶ 11.

The FCC's recognition of a consumer's right to revoke her "prior express consent" to receive autodialed text messages under §227(b)(1)(A) applies equally to autodialed cell phone calls, as both are regulated under the <u>exact same subsection</u> of the TCPA. *Id.*  Practically speaking, both texts and unwanted cell calls cost the consumer money in the form of allotted text limits or air minutes available on their particular phone plans.  Text messages are no different than autodialed calls to cell phones. *Satterfield,* 569 F.3d 952.  The FCC's ruling in *SoundBite* broadly "ensures that wireless consumers will continue to benefit from the TCPA's protection against unwanted autodialed texts." *SoundBite* at ¶ 1.

This protection applies regardless of content – the FCC's ruling covers all autodialed texts, not merely telemarketing texts; and thus all unwanted autodialed calls to cell phones, not merely telemarketing calls.  As stated by the FCC, "prior express consent" is "not unlimited".  It is not irrevocable for life.

### 2.   The SoundBite Ruling Applies to Debt Collection Calls

In *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Report and Order,* 27 FCC Rcd. 1830, 2012 WL 507959, ¶ 18 (hereinafter "2012 Ruling"), the FCC provided an "opt-out mechanism" to revoke consent for telemarketing messages, of which debt collection calls are not a part. *Id.* at ¶¶ 20, 21.  The FCC states that this "automated interactive opt-out mechanism will empower consumers to revoke consent . . . and stop receipt of unwanted auto-dialed or pre-recorded telemarketing calls to which they never

consented. *Id.* at ¶ 48.  The FCC chose to make it easier through this "opt-out mechanism" to revoke consent to receive certain telemarketing calls.  But the agency nowhere held that revocation of consent cannot be accomplished by other traditional means as relates to autodialed or pre-recorded debt collection calls to cell phones. *See SoundBite* at ¶ 13 (recognizing that "requests to stop receiving voice calls . . . can be confirmed during the same call in which the consumer has expressed a desire to opt out.

Plaintiff does not argue that the opt-out mechanism applies here or in any way affects the present case.  Rather, the opt-out mechanism is support for the proposition that consent <u>can</u> be revoked and there is no temporal limitation as to when.

### 3.   The SoundBite Ruling Clarifies That Revocation May Be Done Orally

In paragraph 13 of *SoundBite,* the FCC stated:

> 13. We emphasize that our finding that a one-time confirmation message after receipt of a consumer's opt-out request does not violate the TCPA or Commission rules is limited to a confirmation text, and does not extend to a follow-up confirmation voice call. ***Unlike requests to stop receiving voice calls, which can be confirmed during the same call in which a consumer has expressed a desire to opt out***, confirmation of a request to stop text messages necessarily requires a two-part exchange between the consumer and the sender of such messages. As a result, such confirmation can only be made after the consumer's opt-out request, in a separate and final text message. (Emphasis added).

The language in the *SoundBite* Ruling cited above strongly supports the proposition that consent to be call on one's cell phone can be revoked orally ("can be confirmed during the same call in which a consumer has expressed a desire to opt out."). *Id.*

**B.  PLAINTIFF DID NOT GIVE THE DEFENDANT PERMISSION TO CALL
PLAINTIFF**

Plaintiff respectfully submits that the Court's decision with respect to his TCPA claim is
based upon facts that are simply not supported by the record.

**1.  Plaintiff Did Not Allow Richards to Use Plaintiff's Cell Phone As His Own.**

The Court found that, "Plaintiff allowed Richards to use Plaintiff's cell phone as his
own." (Decision, at 12).  However, the Plaintiff testified at his deposition that during the
admissions process at the hospital, he gave the hospital permission to call him only if Richards
was dead or dying, adding, "Don't call me for anything else". (Kenny Dep. At p. 35).  He further
testified that 1) He never gave Richards possession of his phone, 2) He never gave Richards
permission to use his phone, 3) the phone was in no way a "shared phone"; it was solely
Plaintiff's phone. (Kenny Dep. At p. 35).  There is no contrary testimony.  As such, the Court's
finding that Plaintiff allowed Richards to use his phone as his own is not supported by the record.

**2.  Plaintiff Did Not Give the Hospital or Richard's Physicians Permission to Call
Plaintiff's Cell Phone For the Purpose of Contacting Richards After Discharge.**

The Court found, "Even assuming Plaintiff effectively limited the circumstances in which he
wished to be called, there is no indication he ever advised the hospital or Richards' treating
physicians that they were not to use the number Richards gave on his intake form for the purpose of
contacting Richards after his discharge." (Decision, at p. 12).  Once again, this is not supported by
Plaintiff's uncontradicted deposition testimony.  Mr. Kenny testified as follows:

Q: During that admissions process, did Lloyd give the hospital your cell phone number?

A: Lloyd asked my permission to use the phone.  I was standing next to him and I gave him

the permission to give them my phone number to call me in an emergency situation, ***and I***

***looked at the people and I said, "That means if he's dead or dying.  Don't call me for***

***anything else."***

(Kenny Deposition, at p. 35).

That statement unequivocally informed the hospital that they were not to call his cell phone number for any reason (including presumably to call Richards after discharge) other than to notify Plaintiff that Richards was in the midst of a life threatening emergency.  There was no authorization whatsoever to call the Plaintiff's cell phone to attempt to contact Richards.  Any ambiguity with respect to this fact was eliminated by Mr. Kenny's multiple instructions to the Defendant that they not call him regarding Richard's account thereafter. *See Chesbro v. Best Buy Stores, L.P.* 705 F.3d 913, 918 (9th Cir.2012) ("Any assertion that the calls were not "unsolicited advertisements" because the statutory definition of that term excludes communications made with the recipient's "prior express invitation or permission" is unsupported by the record, which shows, instead, that Chesbro repeatedly asked *not* to be called."),

## C.  EVEN IF IT WERE FOUND THAT PLAINTIFF DID GIVE CONSENT TO CALL HIS PHONE TO CONTACT RICHARDS, HE WAS ABLE TO, AND DID, REVOKE THAT CONSENT

In their reply brief, the Defendant argued for the first time that Plaintiff's "consent" to be called was irrevocable, or in the alternative, if it was revocable, Plaintiff's attempts to do so were ineffective because they were not made in writing.  This memorandum represents Plaintiff's first opportunity to respond to those arguments.

The TCPA forbids the use of "any automatic telephone dialing system or an artificial or prerecorded voice" to call a cellular telephone unless the caller can show that it had the "prior express consent" of the called party. 47 U.S.C.§227(b)(1)(A)(iii).  In its 2008 Ruling, the FCC goes on to state that:

[T]he Commission determined that "persons who knowingly release their phone numbers have <u>in effect</u> given their <u>invitation or permission</u> to be called at the number which they have

given, <u>absent instruction to the contrary.</u>" *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,* 234 FCC Rcd. 559, 2008 WL 65485 (hereinafter "2008 Ruling) (quoting *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,* 7 FCC Rcd. 8752, 1992 WL 690928 (hereinafter "1992 Ruling") (emphasis added).

This Court, citing *Saunders v. NCO Fin. Sys.,* 2012 WL 6644278 (E.D.N.Y.2012),[2] effectively held that once consent is given in the context of debt collection calls, that such consent can never be revoked. (Decision, at 12-13).  By finding as such, this Court implicitly held that the provision in the FCC 1992 Ruling stating that consent will be inferred "absent instructions to the contrary" had a temporal limitation meaning that such contrary instructions must be given at the outset.  Thus, a person may not give consent to be called, and then change their mind later revoke that consent.

The next sentence in the FCC's 1992 Ruling provides that "telemarketers will not violate our rules by calling a number which was provided as one at which the party *wishes to be reached."*  The use of the present tense in this sentence indicates that the FCC intended the "absent instructions to the contrary" clause to be applicable at all stages of a relationship between the caller and the called party, and not just at the initial stages of the relationship. *See Ingalls Shipbuilding v. Director, OWCP,* 519 U.S. 248, 255 (1997) ("First, the use of the present tense (i.e. 'enters') indicates that the 'person entitled to compensation' must be so entitled at the time of settlement."); *Dole Food Co. v. Patrickson,* 538 U.S. 468, 478 (2003 ("We think the plain text of this provision, because it is expressed in the present tense, requires that instrumentality status be determined at the time suit is filed."; *Carr v. United States,* --- U.S. ---, 130 S.Ct. 2229, 2236 (2010) ("[T]he travel requirement in the present tense ('travels') rather

---

[2] *Saunders* relied heavily on *Gager v. Dell Financial Services, LLC,*2012 WL  1942079 (M.D.Pa.2012).  *Gager* is currently on appeal to the Third Circuit. Oral Argument was held May 13, 2013.

than in the past or present perfect ('traveled or 'has traveled') reinforces the conclusion that pre-enactment travel falls outside the statute's compass.  Consistent with normal usage, we have frequently looked to Congress' choice of verb tense to ascertain a statute's temporal reach.").  As the *2008 Ruling* adopted the language contained in the *1992 Ruling,* the additional language found in paragraph 31 thereof is relevant in determining the FCC's intent, and, therefore there should be no temporal limitation on when a consumer can provide "instructions to the contrary." The words chosen by the FCC are deemed to have been chosen carefully.  The FCC is due substantial deference in its implementation of the Communications Act (of which the TCPA is a part), and "even greater deference" when interpreting its own rules and regulations. *SBC Inc. v. Federal Communications Com'n,* 414 F.3d 486, 496 (3d Cir.2005).  "the basic tents of statutory construction apply to construction of regulations and [the Court's] starting point on any question concerning the application of a regulation is its particular written text." *Pa. Fed'n of Sportsmen's Clubs, Inc. v. Kempthorne,* 497 F.3d 337, 351 (3rd Cir.2007).

The absence of a temporal requirement is further supported by the FCC's recent *2012 Ruling,* which made it easier for consumers to opt-out from previously consented-to telemarketing calls.  In this order, the FCC imposed a requirement on telemarketers to include an automated, interactive opt-out mechanism for autodialed or prerecorded telemarketing calls. *2012 Ruling*.  In this ruling, the FCC stated that the opt-out mechanism "will empower consumers to revoke consent if they previously agreed to receive autodialed or prerecorded telemarketing calls and stop unwanted, autodialed or prerecorded telemarketing calls to which they never consented." *Id.*  Thus, the *2012 Ruling* clarifies the FCC's position, which is that individuals **have always been able to revoke consent** to receive calls.  While it is clear that the *automated opt-*out *mechanism* requirement is limited to telemarketing calls (not at issue

instantly), there is nothing in the Order to indicate that the general ability to revoke consent is restricted to this type of call.  Rather, while explaining its decision to limit this mechanism to telemarketing calls, the FCC noted that it declined to extend this mechanism to non-telemarketing calls "because the record does not reveal a level of consumer frustration with non-telemarketing calls that is equal to that for telemarketing calls." *Id.* (footnote omitted).  The FCC did not hold that the consumer lacks the right to stop non-telemarketing calls-nor could such a policy statement be consistent with the Act.

  This Court's decision conflicts with a legion of federal district court cases, including several from this district, that have held that consent may be revoked. The only split in these cases is whether the revocation may be oral, or if the revocation must instead be in writing. *Compare Adamcik v. Credit Control Servs., Inc.,* 832 F.Supp. 744, 749 (W.D.Tex. 2011 (holding that oral revocation of consent is effective because the Act "is silent on how consent to receive autodialer calls can be revoked, but that simply means, for a host of reasons under the common law and canons of statutory construction, that an oral revocation should be effective."); *Gutierrez v. Barclays Grp.,* 2011 WL 579238 *4 (S.D.Cal.2011) ("[P]rior express consent may be revoked orally and need not be in writing.") *with Starkey v. Firstsource Advantage, LLC,* 2010 WL 2541756*6 (W.D.N.Y.2010) (holding that a written request was required to cease debt collection calls using equipment regulated by the TCPA); *Cunningham v. Credit mgmt.., L.P.,* 2010 EL 3791104*5 (N.D.Tex.2010) (following *Starkey*); *Moore v. Firstsource Advantage, LLV,* 2011 WL 4345703*11 (W.D.N.Y. 2011) (following *Starkey*); *Moltz v. Firstsource Advantage,LLC,* 2011 WL 3360010 *% (W.D.N.Y.2011) (Following *Starkey); and Sengenberger v. Credit Control Services, Inc.,* 2010 WL 1791270 *4 (N.D.Ill. (2010).[3]

---

[3] Plaintiff will not repeat his arguments that oral revocation was sufficient as that was previously briefed in his response to Defendant's Summary Judgment motion.

The TCPA and the FCC's *2008 Ruling* call for an analysis akin to the law of torts, specifically a trespass theory.  Consent, evidenced by one's "invitation" or "permission" onto her property can be revoked at any time, but especially after the offensive conduct starts.  Under traditional trespass theory, if an owner has consented to an actor's presence on his property, but revokes that consent, then the actor will be liable for any continuing trespass. *See* RESTATEMENT (SECOND) OF TORTS §171(b).  In the context of consent to occupy land, there is no temporal restriction on when the revocation can take place-it is at the will of the owner. 75 AM. JUR.2D *Trespass* § 77.  After revocation, any continued presence is a trespass. *Baur v. Chevron Chemical Co.,* 631 F.Supp. 1491, 1493 (E.D.Mo.1986).

There is no reason to believe that Congress intended to deprive consumers or other persons of the ability - so common commonly available in most every area of law – to change their minds about their consent.  The case for revocation is even stronger where, as here, consent to receive autodialed calls was implied bylaw, but was never actually expressly given by the Plaintiff.  The legislative history suggest that the ability to choose when to receive calls was an important consideration in passing the TCPA. *See* 137 Cong. Rec. S18785 (Nov. 21, 1991) ("While [the TCPA] will not end all unsolicited calls, it will give back to consumers the freedom to choose how their telephones are used.").  This remedial statute should be interpreted consistent with those purposes, and with notions of consent that are a settle part of legal jurisprudence.

Further, as submitted above at length, the *SoundBite Ruling* appears to have clarified that express consent given under the TCPA can be revoked, and that revocation can be done orally.

## II.      PLAINTIFF HAD A VIABLE CLAIM UNDER 1692d.

The Court analyzed Plaintiff's claim of harassment and abuse primarily under 1692d(5). The Plaintiff does not quarrel with the Court's finding that the sheer quantity of calls made, absent some indicia of harassment or abuse, is insufficient to establish a violation of 1692d(5).  It is submitted that the Court did not fully assess Plaintiff's 1692d claim in any different way than it assessed his 1692d(5) claim.  As such, for the reasons set forth below, Plaintiff seeks to reargue the dismissal of his 1692d claim.

The Court acknowledged that the Plaintiff also claimed that the Defendant violated the FDCPA by calling him after he had made a personal visit to the Defendant's offices and demanded that they stop calling him regarding his brother-in-law's debt. (Decision, at 6-7).  This claim has absolutely no connection with Plaintiff's 1692d(5) claim.  Rather, this claim is made solely under 1692d.

It appears, however, that the Court did not make this distinction.  As a result, the Court imposed a requirement that the Plaintiff prove that the Defendant *intended* to harass, oppress or abuse him.  The Court went on to find that the calls were, at most, the result of negligence.  It is respectfully submitted that this was an incorrect standard.

1692d does not impose a requirement that the Defendant's conduct be intentional. Rather, the statute merely requires that a plaintiff establish that the defendant engaged in conduct "the natural consequence of which is to harass, oppress or abuse any person in connection with the collection of a debt."  This is in keeping with the general principle that the FDCPA is a strict liability statute. *Savino v. Computer Credit, Inc.*, 164 F.3d 81, 86 (2d Cir.1998).

The Court cited *Martin v. Select Portfolio Serving Holding Corp.*, 2008 WL 618788, *6 (S.D. Ohio Mar. 3,2008; *Juras v. Aman Collection Serv., Inc.*, 829 F.2d 739, 741 (9th Cir. 1987),

*cert.denied*, 488 U.S. 875, 109 S. Ct. 192, 102 L. Ed. 2d 162 (1988)); and *Kerwin v. Remittance*

*Assistance Corp.*, 559 F. Supp. 2d 1117, 1124 (D. Nev. 2008) in support of the proposition that

the Plaintiff must prove intent to prevail under §1692d.  The only case among the three cases that

specifically imposes an "intent" standard is the *Martin* case.   But in *Martin* the Court was

focused on the requirements of 1692d(5), and as such, contains no analysis as to whether all

claims under 1692d must establish the intent to harass..

However, a number of cases have held that there is *not* a requirement that a Plaintiff

prove intent to harass under 1692d.  In *Bank v. Pentagroup Financial, LLC*, 2009 WL 1606420

(E.D.N.Y.2009), the Court explained:

> Bank alleges that by being exposed to approximately 30 voicemail messages,
> some of which did not identify the intended recipient of the call, Pentagroup
> violated § 1692d. Pentagroup's argument that the complaint fails because it does
> not allege "any intent to annoy, harass or oppress" is misplaced. Though it is true
> that one of the enumerated means of violating the anti-harassment prohibition is
> the making of telephone calls "with intent to annoy, abuse or harass," § 1692d(5),
> the list of specified violations is explicitly not exhaustive; it is not intended to
> "limit[ ] the general application" of the provision's sweeping prohibition of
> conduct "the natural consequence of which is to harass, oppress, or abuse any
> person in connection with the collection of a debt." A debt collection program that
> negligently misplaces numerous calls to a single wrong number could plausibly
> have the natural consequence of harassment or abuse. Based on the volume of
> calls alleged here and the fact that some did not identify the debt consumer or
> contain a return phone number, I find that Bank has sufficiently alleged an
> "injurious exposure" to offending communication. Because I find that Bank has
> standing to bring his § 1692d(5) claim, Pentagroup's motion to dismiss this claim
> is denied.

*Id.*, *5; *See also: Doyle v. Midland Credit Management, Inc.*, 2012 WL 1666397

(E.D.N.Y.2012); *Sterling v. Genpact Services, LLC*, 2012 WL 952310*2 (C.D.Cal.2010).

In this case, the 1692d claim is that the Defendant continued to call Plaintiff after

Plaintiff requested them to stop calling him 15-25 times, and ultimately visited their offices to

emphatically demand that they stop calling him regarding his brother-in-law's debt. (Kenny

Dep., p. 50, lines 10-25; Dep. of Dellamea, p. 57, line 9).  It has been found that calling a person after a request has been made not to make any further calls is actionable under 1692d. *Connover v. BYL Collection Services, LLC,* 2012 WL 4363740 (W.D.N.Y.,2012); *Arteaga v. Asset Acceptance, LLC,*733 F.Supp.2d 1218 (E.D.Cal.2010); *Skinner v. Green Tree Servicing LLC,* 2012 WL 6554530*8 (N.D.Cal.2012);

In addition to the mere fact that the Defendant continued to call Plaintiff after he requested they stop calling him are the facts that 1) the Plaintiff did not owe the debt the Defendant was calling about, 2) that the Plaintiff had informed the Defendant they were calling the wrong person on multiple occasions, and 3) the obvious fact that Mr. Kenny was completely exasperated at the continued calls, to the point that he made a personal visit to the Defendant's offices to emphasize his displeasure.

With respect to the last factor, it has been held that "[C]laims under § 1692d should be viewed from the perspective of a consumer whose circumstances makes him relatively more susceptible to harassment, oppression, or abuse." *Jeter v. Credit Bureau, Inc.,* 760 F.2d 1168, 1179 (11th Cir.1985); *Clomon v. Jackson,* 988 F.2d 1314, 1318-19 (2d Cir.1993). This standard is similar to that of the "least sophisticated debtor," which applies to other sections of the FDCPA. *Id.*   This objective standard "ensure[s] that the FDCPA protects all consumers, the gullible as well as the shrewd ... the ignorant, the unthinking and the credulous." *Clomon,* 988 F.2d at 1318-19.  Thus, the fact that Mr. Kenny had obviously reached the end of his rope at the times the calls were made, is a valid additional factor further supporting his 1692d claim.

## <u>CONCLUSION</u>

The TCPA is a remedial statute.  Congress clearly felt that consumers and others should have recourse against telemarketers and others who make unwanted robocalls.  Imposing a rule that requires a person who gives consent to such calls to live with such calls the rest of their lives undermines the purposes of the statute, and is frankly unfair.  Consent might be given in a time of crisis, circumstances change, and people understandably change their mind.  As such, it is submitted that for the reasons cited herein, this Court should vacate and reverse its' decision dismissing Plaintiff's TCPA claims.

The Plaintiff was so exasperated at being unable to stop the Defendant's telephone calls that he *personally went to their office* to demand the calls stop.  The Defendant does not deny this.  Yet they took ineffective, or as this Court found, negligent steps to prevent future calls.  As such, it is submitted that the Court's dismissal of Plaintiff's 1692d claim should be vacated and reversed as well.

Dated:  May 30, 2013

/s/Kenneth R. Hiller
Kenneth R. Hiller, Esq.
Law Offices of Kenneth Hiller
*Attorneys for the Plaintiffs*
6000 North Bailey Avenue, Ste. 1A
Amherst, NY 14228
(716) 564-3288
Email: khiller@kennethhiller.com